UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 8:10-cr-386-T-33MAP

JOSE MANUEL NARVAEZ-REINA

**UNITED STATES' RESPONSE TO
DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY**

The United States files this response to the defendant's Motion For Rule 35 (Doc. 61) and this Honorable Court's Order to Respond (Doc. 63).

1.   The defendant filed a motion (Doc. 61) seeking to be released from the custody of the Bureau of Prisons (BOP) due to the threat of COVID-19 infection at his prison facility, Coleman Low FCI. For the reasons set forth below, the United States respectfully submits that the motion should be denied.

2.   The undersigned Assistant United States Attorney has reviewed the defendant's Spanish typewritten motion, which essentially asks this Honorable Court to release him from his sentence because he is 58 years old, incarcerated at Coleman Low FCI where 7 inmates have become infected with COVID-19 and the medical staff is ill-equipped to manage the spread of the virus. In addition, the defendant requests that he be released because he has

assisted in other matters and deserves credit for the cooperation that has been completed to date.

3. The defendant was sentenced by this Honorable Court on December 6, 2012, to a term of incarceration of two hundred and thirty-five (235) months.

4. The undersigned Assistant United States Attorney has checked the BOP website as recently as May 11, 2020, which showed one inmate and one Staff member have been diagnosed with COVID-19, no inmate or Staff member has died from COVID-19 and one Staff member has recovered from the COVID-19 virus. www.bop.gov.

5. COVID-19 is a dangerous illness that, in a short time, has caused many deaths in the United States and a massive disruption to our society and economy. In response to the pandemic, the BOP has taken significant measures to protect the health of the inmates in its charge. To aid this Court in its consideration of [Defendant's] motion, a summary of the BOP's response to COVID-19 follows.

6. The BOP has explained that "maintaining safety and security of BOP institutions is the BOP's highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

7. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. See BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed. It establishes a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." Id. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

8. Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January 2020 by establishing a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

9. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

10.  Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been canceled, as has most staff training.

11.  All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

12.  Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained

community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

13. Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of the BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

14. Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased inmates' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

15. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

16. As part of its response to COVID-19, the BOP may designate certain inmates to a term of home confinement.

17. In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

18. Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney

General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the BOP Director the authority to exercise this discretion, beginning at the facilities that so far have seen the greatest incidence of coronavirus transmission. See April 3, 2020 Memorandum to Director of Bureau of Prisons.

19. Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in BOP institutions. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling incarceration orders.

20. Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to

live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

21.    Here, the defendant does not request home confinement but a release from BOP to return to Colombia. This Honorable Court does not have the authority to grant the defendant's request. This Court has no inherent authority to modify a sentence. *United States v. Diaz-Clark*, 292 F.3d 1310, 1319 (11th Cir. 2002). And the defendant has pointed to nothing giving rise to jurisdiction under the compassionate-release provision of 18 U.S.C. § 3582(c)(1)(A)—or anything else for that matter. But even if there were a jurisdictional mechanism available, defendant has not identified a legal basis that could justify relief because, as detailed below, Covid-19 is not an extraordinary and compelling reason to grant compassionate release.

22.    Furthermore, even if it were, defendant has not sought—much less exhausted—his administrative remedies, which is fatal to his motion. The mere existence of the Covid-19 pandemic—which poses a general threat to every non-immune person in the country—does not fall into either of those

categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020); see also *United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (denying compassionate release because BOP's proposed plan adequately addresses the COVID-19 pandemic).

23.     To classify Covid-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to the BOP's organized and comprehensive anti-Covid-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.  Courts have generally recognized that "it is a rare case in which

health conditions present an 'exceptional reason'" to allow for release where detention otherwise would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008) (considering pretrial detention). A defendant seeking compassionate release bears the burden of establishing that release is warranted. *United States v. Heromin*, 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (J. Covington); cf. *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that a movant for a reduction under section 3582(c)(2) bears the burden to establish a reduction is warranted). Here, the defendant simply has not met his burden.

24. Further, the defendant remains an essential witness in a pending sealed Indictment in the Tampa Division. Once this case is resolved, and absent any adverse information, the government anticipates a Rule 35 motion would be appropriate.

Based upon the aforementioned information, the defendant's motion for release from custody should be denied.

                                    Respectfully submitted,

                                    MARIA CHAPA LOPEZ
                                  United States Attorney

By:   */s/ Joseph K. Ruddy*
       Joseph K. Ruddy
       Assistant United States Attorney
       United States Attorney No. 037
       400 N. Tampa St., Ste. 3200
       Tampa, FL 33602-4798
       Telephone: (813) 274-6000
       Facsimile: (813) 274-6125
       Email: Joseph.Ruddy@usdoj.gov

U.S. v. Narvaez-Reina                                   Case No. 8:10-cr-386-T-33MAP

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2020, a true and correct copy of the foregoing document and the notice of electronic filing were sent by United States Mail to the following non CM/ECF participant:

    Jose Manuel Narvaez-Reina
    Reg. No. 56605-018
    FCI Coleman Low
    P.O. Box 1031
    Coleman, FL 33521

                                         */s/ Joseph K. Ruddy*
                                         Joseph K. Ruddy
                                         Assistant United States Attorney
                                         United States Attorney No. 037
                                         400 N. Tampa St., Ste. 3200
                                         Tampa, FL 33602-4798
                                         Telephone: (813) 274-6000
                                         Facsimile: (813) 274-6125
                                         Email: Joseph.Ruddy@usdoj.gov